818 So.2d 54 (2001)
Loretta TEMPLET, Miriam Leggette, Julious Frederic, Jr. and Odile Frederic
v.
STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
No. 2000 CA 2162.
Court of Appeal of Louisiana, First Circuit.
November 9, 2001.
*55 William E. LeBlanc, Malcolm J. Dugas, Jr., Donaldsonville, Counsel for Plaintiffs/Appellees Loretta Templet, et al.
Richard P. Ieyoub, H. Evans Scobee, Keith C. Armstrong, Baton Rouge, Counsel for Defendant/Appellant State of Louisiana, Through Department of Transportation and Development.
Before: CARTER, C.J., PARRO, and CLAIBORNE,[1] JJ.
CLAIBORNE, J.
At issue in this case is whether the trial court erred in granting plaintiffs' motion for judgment notwithstanding the verdict (JNOV).

FACTS AND PROCEDURAL HISTORY
Loretta Templet, Miriam Leggette, Julious Frederic, Jr. and Odile Frederic (plaintiffs) filed suit against defendant, the State of Louisiana, through the Department of Transportation and Development (DOTD). Plaintiffs alleged that the deaths of their children (Amanda Acosta, Brett Leggette and Brett Frederic) in an automobile accident were caused by a defective condition of Louisiana Highway 42 (Hwy.42) in Ascension Parish, which posed an unreasonable risk of harm, and that DOTD breached its duty to maintain Hwy. 42 in a reasonably safe condition.
The facts giving rise to this lawsuit began around 5:00 p.m. on the rainy afternoon of August 20, 1994. Eighteen-year-old Amanda Acosta was driving eastbound on Hwy. 42 in her mother's Nissan Maxima with two thirteen-year-old passengers, her cousin, Brett Leggette, and his friend, Brett Frederic. The trio were headed to a video store on the two-lane state road which runs in an east-west direction. As Amanda Acosta proceeded east on Hwy. 42, between La. Hwy. 930 and Manchac Acres Road, she lost control of her vehicle, fishtailed in her lane, and then suddenly veered into the westbound lane of traffic, *56 directly into the path of a Ford Bronco. The point of impact was in the straightaway portion of what is referred to in much of the testimony as an "S-curve." (Actually, there was a curve to the left followed by a straightaway about 1/5 to ¼ mile in length followed by a curve to the right.) The Bronco, traveling at approximately 40 to 45 mph, collided directly into the passenger side of Amanda Acosta's vehicle. All three occupants of the Acosta vehicle died immediately. The occupants of the Bronco, Danny Breeland and George Allen, were injured. There were no other eyewitnesses to the accident.
The first jury trial of this matter ended in a mistrial. Eight months later, the second jury trial took place over a four-day period. At the conclusion of the second trial, the jury returned a unanimous verdict in favor of DOTD, denying plaintiffs' claims and specifically finding that Hwy. 42 in the vicinity of the accident did not present an unreasonable risk of harm to others. A judgment reflecting the jury's verdict was signed by the trial court on October 9, 1998. From this judgment, plaintiffs moved, on the same date, for a JNOV or, in the alternative, a new trial. The motion was heard on November 4, 1998. The matter was left open for filing of briefs within fifteen days.
Ten months later, on September 17, 1999, the trial court denied plaintiffs' motion for new trial, but granted plaintiffs' motion for JNOV.[2] The court held that:
[T]he verdict of the trial jury that Louisiana Highway 42 in the area where the accident occurred did not present an unreasonable risk of harm is `wholly unreasonable' and is not supported by the evidence presented in this case....
Because the strong and overwhelming evidence presented at trial showed that Louisiana Highway 42 posed an unreasonable risk of harm, no reasonable juror could have reached a contrary conclusion.[3]
The trial court then determined that DOTD was 10% at fault and the driver, Amanda Acosta, was 90% at fault in causing the accident, stating that "[t]he court must consider all evidence in [the] light most favorable to upholding the jury's verdict. The jury's verdict must be given the benefit of every legitimate and reasonable inference that could have been drawn from the evidence." The trial court held that it "must allocate fault in the light most favorable to the Department of Transportation and Development." Next, the trial court quantified plaintiffs' damages, awarding each plaintiff $250,000 (for a total amount of $1,000,000), subject to a 90% reduction according to the driver's allocated fault in causing the accident. Additionally, the trial court ordered DOTD to pay 50% of the court costs and expert fees.
On October 13, 1999, DOTD appealed, seeking review of the granting of plaintiffs' motion for JNOV. The return date for this appeal was set for December 24, 1999. The record was lodged on September 25, *57 2000. On May 1, 2001, plaintiffs filed a motion for leave to file an answer, as well as an answer to the appeal, seeking affirmance of the granting of the JNOV with a modification of the percentage of fault allocated to the parties in the JNOV. On June 4, 2001, this court referred plaintiffs' motion to file an answer to the merits of the appeal.

PLAINTIFFS' MOTION FOR LEAVE OF COURT TO FILE AN ANSWER
We now decline to consider plaintiffs' request for modification of the percentages of fault allocated by the trial court in the JNOV because plaintiffs failed to comply with the requirements of La. Code Civ. P. art. 2133. That article provides that an answer to an appeal seeking to have a judgment modified, revised, or reversed in part, must be filed "not later than fifteen days after the return day or the lodging of the record whichever is later." In the instant case, the September 25th lodging date was the later of these two dates. Accordingly, plaintiffs had fifteen days therefrom in which to file an answer. Plaintiffs' answer was not filed until approximately eight months later on May 1, 2001, and was, therefore, untimely.
In view of the untimely answer, we are precluded from considering the issue raised by plaintiffs regarding the allocation of fault or otherwise. See Willingham v. Employers Ins. of Wausau, 560 So.2d 481, 482 (La.App. 1st Cir.1990). See also Arnone v. Illinois Central Gulf Railroad Company, 447 So.2d 61, 62 (La.App. 1st Cir.1984). Accordingly, plaintiffs' motion for leave of court to file an answer is denied, and we will not consider the portions of plaintiffs' brief which seek to modify or revise the judgment of the trial court.
We now turn to the merits of defendant's appeal. DOTD asserts the trial court erred in granting plaintiffs' motion for JNOV and in overturning the unanimous jury verdict in favor of DOTD. For the following reasons, we agree.

APPLICABLE LAW
La. Code Civ. P. art. 1811 controls the use of a JNOV. This article provides that a motion for JNOV may be granted on the issue of liability or on the issue of damages or on both; however, the article does not specify the grounds on which a trial judge may grant a JNOV. In Davis v. Wal-Mart Stores, Inc., XXXX-XXXX, pp. 4-5 (La.11/28/00), 774 So.2d 84, 89-90, the Louisiana Supreme Court outlined the standard, as set forth in our jurisprudence, to be used in determining whether a JNOV was properly granted as follows:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. (Citations omitted and emphasis added.)
The motion for a JNOV requires a stringent test because it deprives the parties of their right to have all disputed issues resolved by a jury. See Martin v. *58 Heritage Manor South Nursing Home, XXXX-XXXX, p. 4 (La.4/3/01), 784 So.2d 627, 631. The applicable standard for reviewing a JNOV was further articulated by the Louisiana Supreme Court in Davis, XXXX-XXXX at 4-5, 774 So.2d at 89, as follows:
The standard of review for a JNOV on appeal is a two part inquiry. In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether or not to grant the motion. After determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review. (Citation omitted.)
A JNOV is proper only when the trial court determines that reasonable minds could not reach a contrary verdict. Neither the trial court nor this court can substitute its evaluation of the evidence for that of the jury unless the jury's conclusions totally offend reasonable inferences from the evidence. Thus, in the case before this court, our initial inquiry is to decide whether the facts and inferences point so strongly in favor of a finding that Hwy. 42, in the vicinity of the accident, presented an unreasonable risk of harm and caused the accident in which plaintiffs' children were killed, that no reasonable juror could have reached a different verdict on the issue. If the answer is yes, the trial court was correct in granting the JNOV, and our review would then hinge on the manifest error/clearly wrong standard. However, if the answer is no, the jury's verdict should not have been disturbed, and the trial court was incorrect in granting the JNOV. In that instance, we would be obliged to reinstate the jury verdict. See Davis, XXXX-XXXX at 6, 774 So.2d at 90-91.
When contemplating a JNOV, the trial court is prohibited from weighing evidence, making credibility determinations, drawing inferences therefrom, or substituting its own factual conclusions for those of the jury. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991). Additionally, questions of fact should be resolved in favor of the nonmoving party. Davis, XXXX-XXXX at 4, 774 So.2d at 89; Anderson, 583 So.2d at 832.

REVIEW OF EVIDENCE
After an exhaustive review of the record and the trial court's reasons for judgment, it is clear that the trial court incorrectly applied the standard of review in granting the JNOV as to the jury's verdict.
In the reasons for judgment, the trial court stated:
[T]he uncontroverted evidence presented at the trial showed that:
1. Louisiana Highway 42 at the scene of the accident held water and was virtually flat and rutted.
2. The signing on the highway was confusing. It was so confusing that numerous Louisiana State Police officers could not correctly state the speed limit and had in fact misstated the speed limit.
3. Numerous wrecks had occurred at the accident location.
4. Hydroplaning played a part in the cause of the accident. The hydroplaning was caused by the poor condition of the roadway.
5. The Louisiana Department of Transportation and Development had knowledge of the defective condition of the highway prior to the accident.
The trial court's findings characterize the evidence as "uncontroverted," when in *59 reality there were numerous factual questions the trial court should have resolved in favor of DOTD. Some of the factual issues involved whether Hwy. 42 held water, what the actual posted speed limit in the area of the accident was, whether hydroplaning or driver error caused the accident, and whether DOTD had knowledge of a defective condition on Hwy. 42. The trial court did not view the factual disputes in favor of DOTD; instead, the trial court substituted its own evaluation of the evidence for that of the jury.
It is undisputed that Hwy. 42 is within the state highway system and is maintained by DOTD. However, the jury was presented with conflicting evidence regarding the condition of Hwy. 42 at the site of the accident. The record is replete with evidence of such a conflicting nature that it is impossible to say that reasonable jurors exercising impartial judgment could not reach different conclusions. We find that when all factual questions and reasonable inferences are resolved in favor of DOTD (as the party opposed to the motion for JNOV), reasonable jurors could have reached the conclusion that Hwy. 42 did not present an unreasonable risk of harm to the motoring public.
The jury heard testimony from three different expert witnesses, various DOTD personnel, the investigating state trooper, other state troopers familiar with the area of the accident, a private investigator, and the two eyewitnesses riding in the Bronco involved in the accident.
James R. Clary, Sr., a civil engineer and land surveyor, testified for the plaintiffs and was accepted by the trial court as an expert qualified to testify in highway design and standards, time and motion studies, and surveys. Mr. Clary surveyed the accident site, took photographs of the road, measured the wheel ruts in the eastbound lane of Hwy. 42, reviewed DOTD plans for Hwy. 42, and reviewed the deposition testimony of the Bronco occupants. Mr. Clary testified that the angle of the curve and slope of the crown on Hwy. 42 did not meet any acceptable design standards. He stated that engineering standards call for a positive slope at a minimum of .025 feet per foot, or a little over a three-inch "fall" from the center line to the edge of the pavement. Mr. Clary's cross-section survey results revealed that the eastbound lane of Hwy. 42 was basically flat (.002 slope or about a ¼-inch "fall") in the vicinity of the point of impact, and there was a zero slope at the police investigation reference point for measurements near the point of impact.
Mr. Clary acknowledged that all road curves have a transitional "run-out" period in which a short flat section (zero slope) will naturally occur coming out of the super-elevation of a curve and before the normal slope of a road resumes. He testified that the plans for Hwy. 42, built in 1949 and designed for a 60 mph speed, did not have a specific super-elevation runout or transition section. He stated that the transition section would be an engineering decision, and for this road it would be approximately 250-275 feet. He testified that safe engineering practices would require a very short transition section of the road. However, Mr. Clary also acknowledged that since Hwy. 42 was accepted after it was built, it must have had the correct design features at that time.
Mr. Clary testified that he measured the wheel ruts on Hwy. 42 in six different places near the point of collision. The ruts varied in depth anywhere from 1/8 inch to ¼ inch. It was Mr. Clary's opinion that the combination of the wheel ruts and the flatness of the roadway made a defective condition in Hwy. 42, which led to a dangerous accumulation of water that could not drain when it rained. Mr. Clary also *60 testified that although the Acosta car lost control after the first curve, in the straightaway section of the S-curve, he found the degree of the curve was too sharp and was also not up to safe engineering standards. Mr. Clary did not know where the exact point of the loss of control occurred. Finally, he indicated that the roadway signs that the Acosta vehicle would have encountered driving eastbound were a "Drive Carefully, Substandard Roadway" sign, a chevron sign with a hazard marker facing westbound, then a chevron sign that was double-faced for east and westbound traffic, marking the curve, and a "40 mph curve" sign. Mr. Clary also testified that there was a 45 mph speed limit sign on the westbound lane coming out of the curve.
Plaintiffs' next witness was Walter B. Horne, an expert in hydroplaning. Mr. Horne was very knowledgeable and technical about the dynamics of hydroplaning, because he devised most of the mathematical formulas used to determine hydroplaning speeds.[4] He testified that in order to hydroplane on a roadway, the water depth must be equal to or greater than the tire tread depth. He explained that the speed for hydroplaning to occur depends on tread depth and tire pressure, which he assumed in this case was 29 to 33 psi in order to make his calculations.
Mr. Horne used measurements of the Acosta vehicle's tire tread depths made by the tow-truck driver who removed the vehicle's tires after towing it away. The tread depths were 4/16 inch on the back tires and 5/16 inch on the front tires. Using the wheel rut measurements supplied by Mr. Clary of 2/16 inch to 4/16 inch, he determined that the speed of the Acosta vehicle necessary for it to partially hydroplane ranged from 50.2 to 51.8 mph. He stated that for a complete hydroplane situation to occur, the Acosta vehicle would have to have been going even faster, at 58 ½ mph. Mr. Horne did not believe that the Acosta car completely hydroplaned in this case because more water would have been necessary on the road for that to occur. Instead, he believed that the Acosta car partially hydroplaned at around 55 mph. He relied on the description of the Acosta vehicle's fishtail action witnessed by the driver and passenger of the Bronco. After all of this technical information, Mr. Horne stated that this accident would not have occurred at all if the Acosta vehicle's speed had been 40 to 45 mph. He also acknowledged that a fishtail action can occur with problems other than partial hydroplaning, such as over-controlling or over-steering.
Another witness for plaintiffs was the investigating police officer, Trooper Stephen P. Baum. He testified that the exact point where the driver of the Acosta vehicle lost control could not be determined, but he thought the car went out of control in the eastbound lane, then crossed into the westbound lane. He based this determination on measurements of the final resting point for the vehicles and swerve marks in the road at the accident site. After interviewing the driver and passenger of the Bronco, Trooper Baum estimated the speed of both vehicles to have been around 50 mph. He testified that the posted speed zone in the straightaway section of the S-curve was 45 mph, and that would have been the applicable speed limit for the Acosta vehicle. He was familiar with Hwy. 42, because he had patrolled that area and investigated other accidents in that area for 8 to 9 years. Trooper Baum was positive that the posted speed limit was 45 mph, not only because he was familiar with that section of Hwy. 42, but *61 also because he visually located the speed limit sign for eastbound traffic when he investigated the accident. He also stated that the curve warning sign for eastbound traffic for the first part of the S-curve suggested a reduced speed of 40 mph for the curve. In the accident report, Trooper Baum indicated that there were no major noticeable defects in the road. He purposely looked for and did not find any defective shoulders, deep ruts in the road, or excessive water buildup. Trooper Baum stated that he did not consider the depressions in the eastbound lane of the road to be true ruts.
The deposition testimony of both occupants of the Bronco were read to the jury. Mr. Breeland's account of the accident was that the Acosta vehicle was out of the curve and in the straightaway, when it suddenly began to fishtail in the road. Mr. Breeland believed that the Acosta vehicle was traveling too fast, hit the shoulder of the road, lost control, and then about two seconds later, impacted the Bronco. Mr. Breeland did not recall seeing standing water on the road, but it was raining. Mr. Allen also stated that it was raining when the accident occurred, but it was not a hard rain. He believed the Acosta vehicle was about 50 to 60 feet out of the curve, on the straightaway section of the S-curve, when it lost control and whipped to the left, then right, then to the left and completely sideways in the lane directly in front of the Bronco. Mr. Allen thought the whole process seemed to take 5 to 7 seconds; he had time to put his feet on the dashboard, say "watch it" to Mr. Breeland, and notice the kids' faces in the Acosta vehicle. Mr. Allen believed both vehicles were traveling around 45 to 50 mph. He had no opinion as to why the Acosta vehicle lost control while driving in the eastbound lane.
The first person to arrive on the accident scene was a volunteer fireman, Bryan Belzer. He testified that he drove that section of Hwy. 42 on a regular basis and that when it rained the water tended to puddle in the wheel grooves of the road. He helped Mr. Allen, who was lying in the roadway. He testified that the water in the grooves in the road covered his fingers halfway when he laid his hand flat on the road to pick up Mr. Allen. He estimated that the water was 1/8 inch to ¼ inch deep.
A deputy for the Ascension Parish Sheriff's Office, Jody M. Edmonston, testified that he was the first policeman on the scene of the accident. He did not believe there was an excessive amount of water on the road.
Another witness called by plaintiffs to testify was the district traffic operations engineer for DOTD, Thomas J. Buckley. Mr. Buckley stated that he was in charge of the signs, signals, and pavement markings along Hwy. 42. He stated that there were no shoulders on this area of Hwy. 42. He also testified that the speed limit was set in 1978 at 45 mph. (It had previously been 55 mph.) Mr. Buckley explained that the DOTD manual for maintaining roadways calls for correction of rutting on the road if the water puddles over ½ inch deep. He stated that he had no duty to repair or report a ¼-inch accumulation of water, because the threshold level was ½ inch of water.
Two witnesses, Sarah Steimel and Mary Holloway, who worked near the accident site testified on behalf of the plaintiffs that the speed limit for the straightaway section of the S-curve was 55 mph. Three different state troopers[5] also testified for *62 plaintiffs regarding other accidents in the same area, and that the posted speed limit for the area of the accident was 55 mph. However, none of those witnesses or troopers had any specific knowledge of the accident in question.
Mr. Kent Isarel, a DOTD project development engineer, testified on behalf of plaintiffs regarding the design of Hwy. 42, which was built in 1949. He stated that the standard slope for highways (including Hwy. 42) to help facilitate drainage of water was .025 feet per foot, the equivalent of three inches every ten feet. Mr. Isarel also testified about the transition section coming out of the super-elevation in a curve back to a normal slope, and how it naturally results in a flat section during the transition. He stated that the design does not call for a zero slope, but there is a mathematical point in the transition where there is a zero slope. Mr. Isarel testified that the plans for Hwy. 42 followed the correct slope design, but that 20 years later a highway would not be in its original design condition. He also stated that a long, flat section of the road would not be desirable, but he could not state what the design transition length should have been.
Two DOTD parish highway superintendents, Albert Shields, Jr. and Percy Douglas, testified that they were in charge of the maintenance, upkeep and safety of Hwy. 42. Part of their job responsibilities included driving periodically (every two weeks) over all roadways in their maintenance areas. On the physical inspection drives they would encounter all kinds of weather, including light and heavy rain. They looked for detrimental conditions such as ruts, potholes, lack of crowns, poor shoulder areas, base pavement problems, and road clutter. They testified that the threshold level for repairing rutting on the road was anything over ½ inch deep in any ten foot section of the road. Neither maintenance superintendent ever felt that maintenance for rutting or lack of crown was required on the section of Hwy. 42 at issue. Mr. Douglas testified that when it rains a lot, water will stay on the road, but that does not necessarily make it a hazard.
Dr. Joseph D. Blaschke, an expert in traffic engineering, highway design and accident reconstruction, testified on behalf of DOTD. After reconstructing the known facts of the accident and the positions of the vehicles after impact, Dr. Blaschke opined that the speed of the vehicles at impact was approximately 50 to 55 mph for the Acosta vehicle and 40 mph for the Bronco. He relied on testimony of the Bronco driver and passenger, as well as measurements, pictures and the report from the accident investigation.
Dr. Blaschke also explained the transition from the super-elevation of the curve to the normal slope of the straightaway section of Hwy. 42. He stated that there is a short distance when the road is flat gradually going into and gradually coming out of a curve. Dr. Blaschke used a friction coefficient of .35 to determine that the point where the Acosta vehicle probably left the eastbound lane was approximately 140 feet, or a little more, before the point of impact. Then, using the eyewitness descriptions of the fishtail action of the Acosta vehicle, Dr. Blaschke estimated that the fishtail process probably lasted about three seconds. He opined that traveling at 50 to 55 mph, or at about 80 feet per second, the Acosta vehicle most likely lost control 380 feet prior to the point of impact. Then Dr. Blaschke demonstrated on a large exhibit of the roadway prepared by the plaintiffs' expert, Mr. Clary, that the loss of control had to have occurred when the Acosta vehicle was in the last part of the curve, prior to the straightaway section of Hwy. 42.
*63 Dr. Blaschke testified that the flat section of the straightaway part of the S-curve was longer than normally found; however, he stated that the flat section was not unusual. He also testified that if Hwy. 42 were designed under current standards, the lanes would be wider, there would be shoulders and the curve would not be as sharp. He explained that the "Drive Carefully, Substandard Roadway" sign on Hwy. 42 did not mean that Hwy. 42 was defective. It meant that the highway had narrower lanes and shoulders than more modern highways built with current standards.
Dr. Blaschke further testified that it could have appeared to the Bronco driver and passenger that the Acosta vehicle was out of the curve when it went out of control because it was very near the end of the curve. He demonstrated for the jury with a straight line drawn on the exhibit how the point of loss of control would have been at the end of the curve. Dr. Blaschke testified that in his opinion, hydroplaning did not play any part in the accident because the Acosta vehicle initially went out of control in the curve. He believed that Amanda Acosta lost control in the curve because she was either going too fast around the curve, oversteered in the curve, braked too hard while in the curve, or a combination of all three. Dr. Blaschke testified that there was no defective condition on Hwy. 42 that contributed to the accident.
After Dr. Blaschke testified, DOTD called six witnesses (three state troopers, two DOTD employees, and a private investigator) to verify that the posted speed limit for the accident area since 1978 was 45 mph, with an advisory speed limit of 40 mph in the curve.[6] The DOTD employees also verified that the DOTD maintenance planning manual had a threshold level for correcting ruts or ponds of water on a roadway when the water is ½ inch or over. The consensus of the DOTD employees' testimony was that the puddling in the wheel ruts on Hwy. 42 did not amount to water accumulation that needed to be addressed by the maintenance department.
Our review of the evidence reveals that a reasonable jury could find that Hwy. 42 in the vicinity of the accident did not present an unreasonable risk of harm to others. We conclude that the jury was presented with adequate evidence to decide that the roadway was not so flat and rutted to constitute a defective condition. We also find that the jury had enough evidence to determine that driver error, rather than water accumulation and hydroplaning, was the sole cause of the accident. Considering all of the evidence as set forth above, and the reasonable inferences to be drawn therefrom in favor of DOTD, we cannot say that the jury's verdict is one which reasonable people could not have reached. Therefore, the trial court erred in granting plaintiffs' motion for JNOV.

CONCLUSION
After a thorough review of the record, we do not find that the evidence so strongly and overwhelmingly pointed to only one verdict, or that the jury verdict was so unreasonable, that reasonable men could have only reached one conclusion. The trial court in this case applied an erroneous standard for granting a JNOV. When all reasonable inferences and factual questions are resolved in favor of DOTD, the record clearly indicates that the jury's unanimous verdict, concluding that Hwy. *64 42 in the vicinity of the accident did not present an unreasonable risk of harm, was supportable by a fair interpretation of the evidence presented at trial. Thus, we reverse the trial court judgment granting the JNOV and reinstate the jury verdict.

DECREE
For the foregoing reasons, plaintiffs' motion to file an answer is denied, and the trial court judgment which granted the JNOV is hereby reversed. The original judgment dated October 9, 1998, incorporating the jury verdict in favor of DOTD is hereby reinstated. The reinstated original judgment deferred the taxing of costs incurred at trial. We now render judgment ordering all court costs, including costs of this appeal, to be paid by plaintiffs.
MOTION TO FILE ANSWER DENIED.
REVERSED; JURY VERDICT REINSTATED; AND RENDERED.
NOTES
[1] Judge Ian W. Claiborne, retired, is serving as judge pro tempore by special assignment of the Louisiana Supreme Court.
[2] The delay after submission was apparently caused by unsuccessful settlement discussions. The court said, "[t]he parties attempted to reach an amicable settlement in this case, but were unsuccessful in their attempts."
[3] In denying the motion for new trial, the trial court held that "[a]fter carefully reviewing the evidence in this case, this court holds that a new trial is not warranted. While this court may have partitioned fault between the parties differently had this been a bench trial, it cannot be shown that the jury's verdict, as amended by the `Judgment Notwithstanding the Verdict,' is not in accordance with a fair interpretation of the evidence." The trial court's ruling regarding the motion for new trial has not been appealed by either party.
[4] He was apparently unwilling to reveal the formulas when he was asked.
[5] The state troopers who testified regarding the 55 mph speed limit were: Trooper Randolph Frank Johnson, Trooper Michael D. Noll, Jr., and Trooper Gregory V. Dawson.
[6] DOTD witnesses regarding the 45 mph speed limit were: State Troopers, Thomas G. Joffrion, Jennifer Evans Mistretta, and Travis Deweese; DOTD employees, Carroll J. Phillips and Thomas J. Buckley; and a private investigator, Dennis Kimble.