J^PETTIGREW, J.
Plaintiffs, Charles and Janet Labatut, filed suit against defendant, Air Products and Chemicals, Inc. (“Air Products”), for injuries sustained in a work-related accident. After a jury verdict in favor of Air Products, the trial court granted plaintiffs’ motion for judgment notwithstanding the verdict (“JNOV”), assigning 10 percent of the fault for Mr. Labatut’s injuries to Air Products and awarding damages accordingly. Defendant appealed. Plaintiffs answered the appeal, seeking a reapportionment of fault. For the reasons set forth below, we reverse the JNOV and reinstate the judgment rendered in accordance with the jury’s verdict.
FACTS AND PROCEDURAL HISTORY
At all times pertinent hereto, Charles Labatut was working as a welder for Pax Cryogenics Systems, Inc. (“Pax”). According to the record, Pax, a steel fabrication yard that specializes in fabricating process-piping skids for the industrial gas market, had been working on a skid for Air Products, one of Pax’s biggest clients. The skid, which was designed entirely by Air Products and built by Pax according to Air Products’ specifications, measured 14 feet wide by 30 feet long and was to be used by Air Products as a “pressure-swing absorption” to separate waste gas from good gas. Once the skid in question was completed by Pax, Air Products asked Pax to store the skid until they were ready for it.
On May 11,1998, three employees of Air Products went to Pax to conduct a final quality inspection of the skid in anticipation of finalizing the purchase. At that time, the Air Products’ employees conducted a visual inspection of the skid and arranged to return the next day to conduct an operational test. It was during the course of testing the skid that Mr. Labatut was assigned to weld a drain valve that had been inadvertently left off of the skid. As Mr. Labatut was attempting to weld the drain valve, he observed the valve handle on the instrument air header was obstructing his access to the area where he needed to work. To alleviate this problem, Mr. Labatut moved the handle out of the way, causing the valve on the instrument air header, which was pressurized, to open and | ^release a large volume of air. This release of pressure hit Mr. Labatut, knocking him backwards several feet.
As a result of the injuries sustained in this incident, plaintiffs, Charles and Janet Labatut, individually and on behalf of their minor child Tiffany Labatut, filed suit against Air Products on March 31, 1999.[1] *222 The matter proceeded to a jury trial in May 2001. Following three days of testimony and evidence, the jury returned a verdict in favor of Air Products, finding that although Air Products was at fault in causing the accident, this fault was not a cause in fact of the injuries sustained by Mr. Labatut. On May 29, 2001, the trial court signed a judgment in accordance with the jury’s findings, dismissing plaintiffs’ claims against Air Products with prejudice.
Subsequently, on June 1, 2001, plaintiffs filed a motion for JNOV, or alternatively, a new trial. The trial court granted the JNOV and denied the request for a new trial. In a judgment rendered on August 17, 2001, the trial court assigned 50 percent fault to Mr. Labatut, 40 percent fault to Pax, and 10 percent fault to Air Products. The court also found plaintiffs were entitled to damages totaling $724,081.00 and held Air Products liable for $72,408.00.
It is from this judgment that Air Products has appealed, assigning the following specifications of error:
I. The trial court committed manifest error in setting aside the Jury Verdict by granting the Motion for Judgment Notwithstanding the Verdict.
II. The trial court committed manifest error in its apportionment of fault and award of damages.
Plaintiffs have also appealed and assign error as follows:
I. The jury was manifestly erroneous in finding that the fault of Air Products was not a cause in fact of the plaintiffs injuries and the trial court abused its discretion in refusing to grant a new trial.
II. The trial court committed manifest error in its assessment of fault.
14APPLICABLE LAW
Article 1811(F) of the Louisiana Code of Civil Procedure authorizes a trial court to grant a JNOV on either the issue of liability or of damages or both. The jurisprudence has established the standard for issuance of a JNOV, and for review of a granted JNOV.
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion that is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. Joseph v. Broussard Rice Mill, Inc., 2000-0628, p. 4 (La.10/30/00), 772 So.2d 94, 99.
In reviewing a JNOV determination, an appellate court must first decide whether the trial judge erred in granting the JNOV. A JNOV is proper only when the trial court determines that reasonable minds could not reach a contrary verdict. Neither the trial court nor an appellate court can substitute its evaluation of the evidence for that of the jury unless the jury’s conclusions totally offend reasonable inferences from the evidence. Templet v. State ex rel. Dept. of Transp. and Dev., 2000-2162, p. 6 (La.App. 1 Cir. 11/9/01), 818 So.2d 54, 58. Thus, in the instant case, this court must ask whether the facts and inferences point so strongly and over *223 whelmingly in favor of a finding that the fault of Air Products was a cause in fact of the injuries sustained by Mr. Labatut that no reasonable juror could have reached a different verdict on the issue. If the answer to this question is in the affirmative, the trial judge was correct in granting the motion. If, however, reasonable persons in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the judgment rendered in accordance with the jury verdict should be reinstated. Simoneaux v. Amoco Production Co., 2002-1050, p. 11 (La.App. 1 Cir. 9/26/03), 860 So.2d 560, 567.
1 sWhen contemplating a JNOY, the trial court is prohibited from weighing evidence, making credibility determinations, drawing inferences therefrom, or substituting its own factual conclusions for those of the jury. Additionally, questions of fact should be resolved in favor of the non-moving party. Templet, 2000-2162 at 6, 818 So.2d at 58. The trial judge is not entitled to interfere with the verdict simply because he believes another result would be correct. See Davis v. Wal-Mart Stores, Inc., 2000-0445, pp. 12-13 (La.11/28/00), 774 So.2d 84, 95. This rigorous standard is based on the principle that “[w]hen there is a jury, the jury is the trier of fact.” Joseph, 2000-0628 at 5, 772 So.2d at 99.
REVIEW OF EVIDENCE
During the three-day trial of this matter, the jury heard testimony from various witnesses, including employees of both Air Products and Pax and a safety consultant expert. The jury also considered other documentary evidence concerning the accident.
Michael Frenzel, a safety consultant expert, testified on behalf of the plaintiffs. He indicated that the two primary written standards addressing procedures for the safe handling of pressurized air are promulgated by regulations of the Occupational Safety and Health Administration (“OSHA”) and the American National Standards Institute (“ANSI”). Mr. Fren-zel testified that OSHA and ANSI regulations apply to employers such as Pax, but that construction projects are exempted. Mr. Frenzel also discussed the “Multi-Employer Work Site Doctrine,” OSHA guidelines that address work sites where multiple employers work together. According to Mr. Frenzel, four questions are considered in connection with this doctrine, i.e., who created the hazard, who controls the hazard, who has the ability to correct the hazard, and whose employees have been exposed to the hazard.
Mr. Frenzel stated that as soon as the valve was pressured up, it became a potential hazard and should have been “tagged or locked or noticed in some way.” When asked how widespread the lock-out/tag-out system was in the industry in south Louisiana, Mr. Frenzel testified that these procedures were “widely-used methods of controlling an energy source” and that “any company of any size has very formidable lockout and tag-out procedures.” With regard to the specifics of this case, Mr. Frenzel testified as follows:
| fi[T]he general industry, although it doesn’t require a padlock ... it does require that tags or signs, which are warnings of hazards, temporary or permanent, affixed or placed at the locations where hazards exist, that this valve, which is the access to the hazard, should have had, as a minimum under either standard, either had a lock or a tag, and I would, in this ease, recommend a tag because of the relatively short duration and the close proximity which everybody is. I think a tag would *224 have been sufficient that said, “Do not operate this valve.”
Mr. Frenzel opined that because Air Products was doing the testing, knew what valves would be involved, and were the “closest to the valve,” Air Products should have tagged or locked the valve as soon as Pax pressured up the skid. He admitted, however, that the determination of who actually had the obligation under OSHA and ANSI regulations to tag or lock the valve was a question of fact for the jury to decide.
James Cunningham, an Air Products’ instrumentation technician for the past 26 years, testified about his involvement in the testing of the skid in question. According to Mr. Cunningham, he and two engineers from Air Products, Mike Bolin-ski and Michael Dyzel, went to Pax on May 11, 1998, to conduct a final quality inspection of the skid in anticipation of finalizing the purchase. The function test was scheduled for May 12, 1998, at which time Mr. Cunningham asked Pax to “pressure up” the instrument air header so he could begin the testing. At around 11:00 that morning, while compiling a “punch list” of problems or errors in the skid, they discovered a missing drain valve that had been inadvertently left off of the skid. Michael Dyzel advised Shannon Allen, production manager/project engineer at Pax, of the missing valve and a few other problems with the skid that needed to be corrected by Pax.
After speaking with Mr. Allen, Mr. Dyz-el returned to the skid with Mr. Bolinski and Mr. Cunningham, who continued checking the valves to be sure they were “stroking correctly.” Approximately thirty minutes later, the Air Products’ employees walked away from the skid intending to leave for a lunch break. Mr. Cunningham testified that when he decided to leave for lunch, he did not ask anyone to take the pressure off of the instrument air header, nor did he request that the valve be locked or tagged so as to warn others that it was under pressure. Moreover, Mr. Cunningham acknowledged that he did not lock or tag the valve before leaving for lunch. When asked if he could have |7depressurized the instrument air header, Mr. Cunningham replied that pursuant to Pax’s rules and regulations in place at the time, he was told he could not. Mr. Cunningham indicated that although he had control of the skid to the extent that he could do his testing, he did not have exclusive control of the skid.
According to Mr. Alien, after speaking with Mr. Dyzel about the “punch list” compiled by Air Products, he went out to the skid with a fitter and Mr. Labatut to show them what needed to be done with regard to the missing drain valve. Mr. Allen testified that he told both the fitter and Mr. Labatut that while they would be working on the skid, Air Products’ employees were checking valves on the skid. He also advised them that the instrument air header was pressurized and pointed out the gauge on the line showing that it was pressurized. After telling Mr. Labatut what needed to be done, Mr. Allen walked away from the skid and returned to his office. Mr. Allen testified that although he did not see the accident, he walked out of his office after hearing a noise and found Mr. Laba-tut on the ground in front of the skid.
Mr. Labatut explained that on the day in question, he was at his workstation when his foreman told him about the missing drain valve on the skid. Mr. Labatut did not know that representatives from Air Products were there conducting the final inspection. He proceeded outside to the skid and met with Mr. Allen who told him what needed to be done. According to Mr. Labatut, Mr. Allen never told him that the skid was pressurized. Moreover, there *225 were no warning signs, barricades, flags, tags, or locks on the valve in question. Mr. Labatut indicated he never saw the pressure valve and was unaware that the skid was pressurized.
While working on the drain valve, Mr. Labatut was unable to see all the way around the valve because the valve handle on the instrument air header was obstructing his view. Not knowing the line was under pressure, Mr. Labatut moved the handle out of the way. When asked what happened next, Mr. Labatut stated “once I opened it, I was thrown back and — and maybe knocked out for a second, and I got up, and I reached for the handle with my right arm, realized that I couldn’t— couldn’t move my arm, and then, I turned it off with my left arm.” With regard to what caused his accident, Mr. Labatut |Rwas asked if he claimed that Air Products did anything to cause the accident. He responded, “Not Air Products, no.”
Mr. Allen testified as follows about the procedures employed by Pax for assisting with the testing of skids:
Q. What procedures do you do if someone like, say, Air Products wants to come down to do a test on a PSA skid; what do you do? What role do you play in that?
A. Typically, I provide them with air supplies to the unit to test the unit with. I also supply them with the required electrical currents and voltages that they’ll be needing to test those skids with. I also supply them with manpower, as they are on my job site.
Q. Now, when you say you supply air to them, can you be a little bit more detailed with me as to where you put air and what’s aired up by you?
A. If a client were to require air to a particular system on a skid, I would physically or a representative of mine, an employee of mine, would physically go out and connect an air hose from an air compressor to that piece of equipment and physically charge that system, turn the air on, so to speak.
Q. Okay. Did that happen in the test of this particular skid that we’re dealing with that involved Mr. Labatut’s accident?
A. Yes, it did.
Q. Okay. And which employee is the employee of yours that aired it up that day?
A. Paul Bourque.
Q. Do you know what part of the skid he aired up?
A. He aired up what I directed him to air up, the instrument air system.
Q. Okay. And that’s previously been identified to the jury. Is that the same thing as the instrument air header?
A. Correct.
Q. Okay. And who’s job is it to depressurize that skid?
A. It’s mine or my representative, and typically, that would be Paul Bourque.
Q. Okay. Now, at what point would it be depressurized?
A. When all tests or function checks were complete or at the end of a shift typically.
19Paul Bourque also testified, confirming that he was the one who hooked the air hose to the instrument air header on the day of the accident. Mr. Bourque added that it takes about 10 to 15 minutes to pressure up the line in question. Mr. Bo-urque also indicated that he opened the valve on the instrument air header so that the gauge would show that it was pressurized.
Mr. Allen provided the jury with an overview of the weekly safety meetings that are conducted at Pax. According to Mr. Allen, he conducts the meetings and *226 all Pax employees are to attend regularly. Mr. Allen was asked specifically about the safety meeting of May 11, 1998, the day prior to Mr. Labatut’s accident. The minutes from the meeting reflect that Mr. Allen conducted the meeting and that Mr. Labatut was in attendance. Mr. Allen indicated that among the topics discussed at the May 11 safety meeting was the risk of injury associated with compressed air. Mr. Allen also explained to Pax employees that during the course of the upcoming week, there would be representatives from Air Products in the shop to conduct a function check of the skid in question and that at some point, circuits would be energized to include pressurized lines.
Also testifying about safety procedures in place at Pax was Michael Person, safety director at Pax during the time in question. Mr. Person indicated he was familiar with the custom in the industry to follow lock-out and tag-out procedures when working with pressurized air. He acknowledged that these procedures were not employed in this case. With regard to the safety rules that all Pax employees were given, Mr. Person indicated that Mr. Labatut received a copy of same in February of 1995. However, there was nothing in the safety rules about opening or closing valves that might be under pressure or and references to lock-out or tag-out procedures.
With regard to the ownership of the skid, Mr. Allen emphasized that ownership of the skid had not yet transferred to Air Products. The skid was still on Pax’s premises and had not been delivered to Air Products. Rather, representatives of Air Products, as intended buyers, were allowed access to the skid to conduct tests. They had no control or authority over the Pax employees who were also working on the skid.
|inMr. Allen testified that he knew of no industry standard as far as what is required with regard to tagging or barricading skids that are under pressure. Mr. Alien acknowledged that although he knew the skid was under pressure, he did nothing to the skid that would serve to warn others about the pressurized line. The following colloquy occurred concerning this point.
Q. Let me ask you a couple of things about safety procedures. You testified earlier that you knew the skid was under pressure?
A. Correct.
Q. Okay. Now, the skid was not flagged or barricaded in any way; is that correct?
A. That’s correct.
Q. Okay. Now, could you have done that if you so chose; could you have flagged it and barricaded it, put up signs, ribbons, balloons?
A. Certainly.
Q. Okay. And you chose not to do that?
A. Correct.
Q. Okay. Could you have tagged the valve that’s in question?
A. Yes.
Q. And you chose not to do that?
A. Correct.
Q. Could you have locked the valve if you wanted to, put a lock on it so that no one could open it or close it?
A. Could have put a lock on it. The handle could have physically been removed.
Q. But you chose not to do that?
A. Correct.
In granting the JNOV in favor of plaintiffs, the trial court found that “although fault and cause in fact are separate issues, the jury’s decision is not one which reasonable minds could render and is also *227 contrary to the law and evidence.” The court further noted that “ ‘but for’ the failure of Air Products either to release the air from the skid before going to lunch and allowing the Pax employees to work on the skid, or to Inlock or flag and tag the valve which Charles Labatut turned, the accident would not have happened.” The court determined that the fault of Air Products was a cause-in-fact of Charles Labatut’s injuries, concluding that “ ‘[b]ut for’ the negligence of Air Products, Charles Labatut would not have been injured.” We disagree.
Based on our review of the entire record, we must find that the trial court erred in granting the JNOV. Although we may have also found differently than the jury, neither this court nor the court below sat as the triers of fact. In this case, it was the jury’s role to accept or reject the testimony of the various witnesses, not the court’s. The facts and inferences do not point so strongly and overwhelmingly in favor of plaintiffs that reasonable persons could not have found against them. Specifically, considering all the evidence in the light most favorable to Air Products, the jury could have reasonably found that the fault of Air Products was not a cause in fact of the injuries sustained by Mr. Laba-tut. We conclude that the jury was presented with adequate evidence to decide that Air Products was not in control of the skid at the time of Mr. Labatut’s accident and that Mr. Labatut would have been injured regardless of what Air Products did or did not do. Considering all of the evidence as set forth above, and the reasonable inferences to be drawn therefrom in favor of Air Products, we cannot say the jury’s verdict was one that-reasonable people could not have reached. Thus, we reverse the JNOV and reinstate the May 29, 2001 judgment.[2]
DECREE
For the above and foregoing reasons, the trial court’s August 17, 2001 judgment granting JNOV in favor of plaintiffs is hereby reversed. The original judgment dated May 29, 2001, incorporating the jury verdict in favor of Air Products and dismissing plaintiffs’ claims with prejudice is hereby reinstated. All costs associated with this appeal are assessed to plaintiffs.
JNOV REVERSED; JURY VERDICT AND MAY 29, 2001 JUDGMENT REINSTATED.
DOWNING, J., dissents and assigns reasons.
CARTER, C.J., dissents for reasons assigned by Judge DOWNING.

. Plaintiffs also filed suit against Mr. Laba-tut's employer, named in the original petition for damages as "Pax Inc., Pax Cryogenics Systems, Inc., and/or Pax-Fab, Inc.,” and National Union Fire Insurance Company of Louisiana, as insurer of Air Products. According to the record, all of these defendants were subsequently released as parties, and plaintiffs' claims against them were dismissed with *222 prejudice. Thus, the instant appeal concerns only plaintiffs' claims against Air Products.

. Because we reverse the JNOV and reinstate the May 29, 2001 judgment, we need not address the remaining issues raised by Air Products and plaintiffs.