860 So.2d 560 (2003)
Wayne SIMONEAUX, et al.
v.
AMOCO PRODUCTION COMPANY, Newpark Resources d/b/a New Park Environmental Services, Jolen Operating Company, and South Oak Production Co.
Diane Simoneaux Alexander
v.
Amoco Production Company, et al.
Nancy Simoneaux Alexander
v.
Amoco Production Company, et al.
No. 2002 CA 1050.
Court of Appeal of Louisiana, First Circuit.
September 26, 2003.
Order Denying Rehearing December 4, 2003.
*562 Victor Marcello, Donald Carmouche, John Carmouche, Gonzales, for Plaintiffs Wayne Simoneaux, et al.
Linda Akchin, James Dore Baton Rouge, for Appellants Amoco Production Co. and Atlantic Richfield Co.
William Goodell, Jr., Lafayette, for Plaintiffs Wayne Simoneaux, et al.
Glynn Long, Donaldsonville, for Plaintiff Nancy Alexander and Diane Alexander.
Panel of Judges composed of FRANK FOIL, BRADY M. FITZSIMMONS and WILLIAM F. KLINE, Jr.[*]
FOIL, J.
This appeal contests a trial judge's entry of a judgment notwithstanding the verdict (JNOV) to overturn a jury's damage award. We reverse and reinstate the jury verdict.

BACKGROUND
On June 13, 1997, owners of property in the Napoleonville Field, located in Assumption Parish, on which oil and gas exploration activities had been conducted, filed this lawsuit in the 23rd Judicial District Court for the Parish of Assumption against various mineral lessees. Named as defendants were Amoco Production Company (Amoco), Atlantic Richfield Corporation (ARCO), Jolen Production Company and Jolen Operating Company (Jolen), Southoak Production Company and Vintage Petroleum Company.[1]
Plaintiffs alleged that their property had been contaminated by the lessee's use of earthen pits for the containment of oilfield wastes. They asserted causes of action in negligence and strict liability. Specifically, plaintiffs alleged that there was widespread contamination at seven well sites. The landowners averred that drilling mud, produced water and a broad spectrum of toxic and radioactive wastes and chemicals had been disposed in and around the wells in open waste pits. Plaintiffs alleged that defendants knew that the practice of pit disposal and waste burial would result in seepage and subsurface migration of the hazardous wastes. They also claimed that the Louisiana Mineral Code and Louisiana *563 lease law imposed an obligation on defendants to restore their property to its original condition, and posited that defendants breached that obligation by failing to remove the contaminants from the property. The property owners sought to recover the costs of restoring the land to its original, unpolluted state, damages for the unauthorized disposal of wastes on their property, punitive damages and personal injury damages for the fear of contracting cancer and other illnesses.
Prior to trial, numerous motions were filed. Plaintiffs settled with and dismissed Southoak from the suit, and also dismissed Jolen.[2] A nine-day jury trial was held, during which conflicting testimony was offered regarding whether the site had been contaminated with hazardous wastes, whether oilfield cleanup was required at the seven well sites, and the appropriate plan for remediation.
At the conclusion of the trial, the jury returned a verdict finding that only one of the seven well sites, Simoneaux 1, required remediation or cleanup. The jury found that Amoco, ARCO, Jolen and Southoak were at fault in causing damage to this site, assessing each with 25% fault. The jury declined to enter any award on plaintiffs' fear of cancer claims or punitive damages claim, and awarded the sum of $375,000.00 for the cost of restoring the Simoneaux 1 site.
The trial judge entered judgment in accordance with the jury's verdict. Thereafter, plaintiffs filed a motion for JNOV, urging that there were numerous inconsistencies in the jury's responses to interrogatories contained in the verdict form, requiring that the judge enter a JNOV to reconcile the inconsistencies. Plaintiffs asked the judge to award damages with respect to all seven sites in accordance with the evidence presented by their experts. Additionally, plaintiffs insisted that the judge find Amoco and ARCO liable for contamination at all seven well sites, and reapportion liability.
In the alternative, plaintiffs demanded a new trial, contending that Amoco was guilty of improperly influencing the jury. They also asserted that one juror was guilty of misconduct, and urged the fact that two jurors resided outside Assumption Parish rendered the verdict invalid as a matter of law, thus necessitating a new trial.
The trial judge granted the JNOV, reversing the jury's liability determinations, fault apportionment and damage award. The judge found that there were numerous inconsistencies in the jury interrogatories requiring that he overturn the jury's verdict. In so doing, the judge found that contamination existed at all seven sites and held that Amoco and ARCO were liable for restoring all seven sites. The judge adopted plaintiffs' experts' plan of remediation, with several modifications, and awarded plaintiffs over twelve million dollars in remediation costs. He further granted the plaintiffs' motion for a "conditional new trial," on the basis that two of the jurors were not residents of Assumption Parish at the time of the trial.
Amoco and ARCO appealed, asserting nine assignments of error. First, they challenge the liability rulings in several respects. Defendants insist that the judge erred in granting the JNOV where the jury's finding that six of the seven oilfield sites required no further restoration was fully supported by the evidence. They also contend that the trial judge and jury *564 improperly imposed liability in tort and contract on Amoco and ARCO for those sites the two defendants did not actually operate, but merely held financial interests therein.
Defendants also challenge a number of pre-trial rulings by the trial judge, including the judge's failure to: (1) recognize the primary jurisdiction of the Louisiana Office of Conservation (LOC) over oilfield remediation; (2) dismiss the claims for restoration of Simoneaux 1 on the grounds of prescription and/or res judicata and to dismiss the tort claims for all other sites on the basis of prescription; (3) dismiss the claims for restoration by landowners whose property was not impacted by the alleged contamination; and (4) dismiss claims for restoration damages by landowners who acquired their interests after the alleged contamination occurred.
Other challenges made by defendants in this appeal attack the judge's granting of a conditional new trial, as well as the reasonableness of a $12,907,440.00 award for restoration of property having a fair market value of $71,500.00.
Plaintiffs answered the appeal, insisting they should have been awarded punitive damages and damages for fear of contracting cancer and other illnesses. They also submit that the judge's award for cleanup and remediation is inadequate. Plaintiffs failed to brief the punitive damage claim and cancer claims and by virtue of Rule 2-12.4 of the Uniform Rules, Court of Appeal, these claims are deemed abandoned.
Alternatively, the plaintiffs submit, if this court should reverse the liability findings, the judge erred by failing to grant a new trial on the basis of evidence demonstrating undue influence of the jury and inappropriate contact by Amoco's representative with members of the jury during the course of the trial. Other alleged errors in the brief, including various evidentiary rulings and the interest award, were not briefed and are deemed abandoned.

PRE-TRIAL RULINGS
Before addressing the propriety of the judge's action in granting a JNOV, we first consider defendant's attacks on various pre-trial rulings by the trial court. The defendants assert that the trial judge should defer primary jurisdiction to the Louisiana Office of Conservation (LOC) or Louisiana's Department of Environmental Quality (DEQ) on any matters concerning an assessment of the remediation of the property. The trial judge refused to defer to administrative agencies on the issue of the scope and method of any remediation plan submitted by the parties.[3]
The defendants argues that the trial judge abused his discretion by refusing to defer the issue of proper oilfield site remediation to the LOC. The defendants ask that this court vacate the judgment and refer the issue of proper oilfield site remediation to the LOC. We decline to do so. In a recent case, Corbello v. Iowa Production, 02-0826 (La.2/25/03), 850 So.2d 686, the Louisiana Supreme Court made it clear that in enacting the Oilfield Site Restoration Law, La. R.S. 30:80 et seq., the legislature preserved the right of a private landowner to seek redress against oil companies in the court system. The court stressed that private landowners had no duty to seek relief from an administrative agency prior to filing suit against an oil company, observing that damages *565 from soil pollution are within the conventional knowledge and expertise of the trier of fact. Corbello, 02-0826 at p. 12, 850 So.2d 686. In light of these precepts, we find no abuse of the trial judge's discretion in his preliminary decision to allow the jury to address the issue of appropriate remediation without the necessity of awaiting a determination by the LOC.
The defendants also contend that the judge erred in not dismissing the suit on the basis of prescription, in not finding that the claims had been compromised and in failing to dismiss claims of subsequent purchasers. We have considered these arguments, but find no error in the trial judge's ruling thereon.

NEW TRIAL
Next, we examine the correctness of the trial judge's ruling granting a conditional new trial. It is axiomatic that if the jury verdict was illegally rendered, as the trial judge found, the judge could not thereafter assess the reasonableness of that verdict in ruling on the motion for JNOV. We first address the basis on which the trial judge found a new trial was warranted, that being the fact that two jurors lived outside of Assumption Parish at the time of the trial.
Article 5, Section 33(A) of the Louisiana Constitution provides that a citizen of this state, who has reached the age of majority, is eligible to serve as a juror in the "parish in which he is domiciled." Louisiana Revised Statute 13:3041 states that the qualification of a juror in a civil case is governed by Article 401 of the Louisiana Code of Criminal Procedure, which provides that a juror must have "resided within the parish in which he is to serve as a juror for at least one year immediately preceding his jury service."
The trial judge informed prospective jurors of the qualifications for serving on the jury, one of which included living in Assumption Parish for one year prior to service. The jurors were instructed to report to the bench if they did not meet the requirements for jury service. Plaintiffs did not question potential jurors on the residency requirement for jury service during voir dire.
After the jury verdict was rendered, plaintiffs' attorneys questioned the jurors in the case, and learned that two of them were residing in Ascension Parish at the time of the trial. At the hearing on the motion for a new trial, Juror Beverly Cavalier testified that she had been living in a home she and her husband were leasing to operate a farm, in Donaldsonville, for about four years before the trial. Prior thereto, she resided in Assumption Parish, where she owns land, votes, works, receives mail, and where her children attend school. She attested that she planned to move back to her Assumption Parish property. Mrs. Cavalier testified that she considered Assumption Parish to be her permanent residence, and Ascension Parish to be her temporary residence.
Juror Trainett Sherman testified that she lived in Donaldsonville for about seven or eight months prior to the trial, moving there from Assumption Parish, where she lived for 20 years with her grandmother. Ms. Sherman, who works in Gonzales and votes in Assumption Parish, attested that she considers her residence to be in Assumption Parish.
Plaintiffs submitted, and the trial judge found, that because both jurors were not "domiciled" in Assumption Parish at the time of the trial and neither lived in that parish for one year before they served on the jury, the two did not meet the constitutional and statutory requirements for jury service. This defect, the judge concluded, rendered the jury verdict illegal, thus entitling plaintiffs to a new trial.
*566 We disagree. Even in a criminal case, where a defendant discovers after a verdict that a juror was unqualified because of lack of residency or some other defect, in order to take advantage of the defect and receive a new trial, the defendant must establish that he was not aware of the disqualification and that this information could not have been ascertained by due diligence. See State v. Folse, 623 So.2d 59, 67 (La.App. 1 Cir.1993). In this case, plaintiffs made no effort to question the jurors on their residency qualifications, although they could have ascertained this information during voir dire. Therefore, under the law, they were not entitled to a new trial on the basis of the alleged residency defect.
Furthermore, even if the jurors were not qualified under Louisiana law, (a decision we need not make at this time), it is clear that the validity of the verdict is unaffected because the verdict was unanimous. In a trial by jury of twelve, only nine jurors must concur to render a verdict. La.Code Civ. P. art. 1797(B). A polling of the jury on the issues crucial to the case revealed the jury verdict was unanimous. As only nine votes were needed to render a verdict, the votes of Mrs. Cavalier and Ms. Sherman were not necessary for a valid verdict, and the plaintiffs cannot prove they suffered any prejudice from the two jurors' residency status at the time of trial.
Next, we address the plaintiffs' contention that the judge erred in refusing to grant them a new trial on the basis of jury tampering and juror misconduct. Louisiana Code of Civil Procedure art. 1972(3) provides that a new trial shall be granted "[w]hen the jury ... has behaved improperly so that impartial justice has not been done." Plaintiffs argue there was evidence that an Amoco employee, Donald Johnson, improperly influenced the jury, along with evidence of misconduct of a juror, Carla Joseph. The record reflects that Mr. Johnson, an Amoco employee, sat at Amoco's defense table during the trial. Mr. Johnson, a resident of Thibodaux, was asked by Amoco to assist in jury selection. He denied speaking to any of the jurors after trial began except to greet them in the morning and ask how they were doing. Two jurors testified that prior to being chosen as a juror, they spoke with Mr. Johnson, who told them that the Simoneauxs had "already been paid" for their sugarcane damage.
Regarding the allegation of juror misconduct, Juror Carla Joseph admitted she knew Mr. Johnson through a friend. She also admitted that she made calls on a cell phone during jury deliberations. Two jurors testified that Ms. Joseph told the person she was talking to on the cell phone that the jury was going to stall the case until 3:30 p.m., and then have a party. Plaintiffs claim that Ms. Joseph's conduct was highly suspicious, suggesting that she was talking to Mr. Johnson during jury deliberations.
Under Louisiana law, the party seeking a new trial based on jury misconduct must prove that the level of behavior was of such a grievous nature as to preclude the impartial administration of justice. Brown v. Hudson, 96-2087, p. 4 (La. App. 1 Cir. 9/19/97), 700 So.2d 932, 935, writ denied, 1997-2623 (La.1/9/98), 705 So.2d 1103, cert, denied, 524 U.S. 916, 118 S.Ct. 2297, 141 L.Ed.2d 157 (1998). We find that the evidence offered by plaintiffs falls far short of this substantial burden, and we find no error in the trial judge's refusal to grant a new trial on the basis of jury tampering and misconduct.

JNOV
Article 1811(F) of the Louisiana Code of Civil Procedure authorizes a trial court to *567 grant a JNOV on either the issue of liability or of damages or both. The jurisprudence has established the standard for issuance of a JNOV, and for review of a granted JNOV.
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. Joseph v. Broussard Rice Mill, Inc., XXXX-XXXX, p. 4 (La.10/30/00), 772 So.2d 94, 99. The trial court may not evaluate the credibility of witnesses in ruling on the motion, and all reasonable inferences or factual questions should be resolved in favor of the nonmoving party. Id., 2000-628 at p. 5, 772 So.2d at 99. This rigorous standard is based on the principle that "[w]hen there is a jury, the jury is the trier of fact." Id.
In reviewing a JNOV determination, this court must first decide whether the trial judge erred in granting the JNOV. This court employs the same standard the trial judge does in deciding whether or not to grant the motion. This court must ask whether the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict. If the answer to this question is in the affirmative, the trial judge was correct in granting the motion. If, however, reasonable persons in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated. Id.
The record reflects that the Napoleonville Field is located in the middle of a sugarcane field and residential area, on the north flank of a large salt dome. Plaintiffs sought to establish that Amoco's oil and gas exploration activities caused soil and groundwater contamination at seven well sites: Simoneaux 1, 2 and 3; A Breaux, Dugas, Bourg and Hebert. Amoco drilled and operated Simoneaux 1, 2, 3 and A. Breaux, all of which were located on the east side of the Napoleonville Field. F.A. Callery drilled and operated the Dugas, Bourg and Hebert wells, located on the west side of the field. ARCO never operated any of the wells, but held a "nonoperating working interest" in all seven well sites.
Production at the field began in 1957, with the drilling of Simoneaux 1. During drilling operations, as oil and gas is pumped to the surface, the well starts to produce not only oil and gas, but also saltwater. This waste byproduct of the extraction of oil and gas from wells is called "produced water."
In 1958, the well at Simoneaux 1 started producing water. In the 1960s, Amoco drilled Simoneaux 2, 3 and Breaux. The produced water from the wells was stored in open, earthen, unlined pits at the well sites for evaporation. Amoco was aware that this type of storage could lead to seepage through the pit's retaining walls. In 1962, Amoco drilled a well at the Simoneaux 1 central tank battery to dispose of saltwater by injecting it into the subsurface. From 1962 to 1969, all of the produced water at the four wells operated by Amoco was disposed of in this saltwater disposal well. Produced waters were *568 placed in the pits temporarily and pumped from the pits to the injection well.
Saltwater production at the field ceased from 1963 to 1967. In 1968, the Simoneauxs made a crop damage claim. Investigation of the claim revealed that crops were not growing in a 0.276-acre area due to saltwater seepage from the pit at the Simoneaux 1 centralized tank battery, which entered the adjacent sugarcane field.
In 1970, Amoco installed a closed saltwater disposal system to handle a recent recurrence of saltwater production and to prevent any additional land damage due to saltwater seepage. In this system, the saltwater was separated from the oil and contained in a closed vessel. The saltwater was then pumped from the steel tank and injected into a saltwater disposal well. All of the wells were connected to the tank at the Simoneaux 1 facility. The pits were used only for emergency storage purposes in the event the well was not running properly.
In 1972, the Simoneauxs made another crop damage claim. Amoco had the site investigated, and the survey conducted thereon indicated that saltwater had migrated from the well and pit site at the Simoneaux 1 central tank battery facility onto the surface and through the topsoil. Amoco paid the crop damage claim.
From then until the 1980s, routine oil and gas operations were conducted at the field. In the mid 1980s, Louisiana regulatory officials began to look into establishing guidelines for pit closures. Dr. Lloyd Deuel, Jr., a soil chemist, researched 750 pits in Louisiana. His research revealed that the chief constituent in produced water is chlorides from salt that is brought up during the drilling process. Researchers also found that other elements could be brought to the surface with the saltwater that naturally occurs in the environment. These elements include arsenic, heavy metals such as zinc, lead, chromium and barium, and radioactive elements such as radium.
In 1985, LOC issued Office of Conservation Statewide Order 29-B governing the construction, maintenance and closure of production and other pits. The guidelines called for the closure of all earthen pits by 1989 and set forth the standards for closure. These regulations set forth acceptable levels of oilfield waste constituents. Louisiana also has two other regulatory guidelines that apply to oilfield wastes: RECAP and NORM regulations. RECAP is a "risk-based corrective action program" instituted by DEQ, as are the NORM regulations, which set forth standards for oilfield naturally occurring radioactive materials.
Also in 1985, Amoco sold its interests in the Napoleonville Field to Jolen Operating Company. Southoak took over operations on the wells previously operated by Amoco. On the west side of the field, Petro-Lewis purchased F.A. Callery's interest in the wells, which were operated at various times by Vintage, Petroleum, Southoak and Jolen.
In 1993, Jolen hired Steward Stover, an expert in hydrology and geology, to assess the field to determine whether it was in compliance with environmental regulations. Mr. Stover did a survey at the field of every well operated by Jolen and found only two areas of equipment that had NORM materials above the regulatory standards, both of which were located at the Simoneaux 1 site. Jolen contracted with another company to clean the area, containerize it and dispose of the material. The contractor placed the materials into two 55-gallon drums, sealed them and left the drums at the site.
*569 In 1997, DEQ received a complaint from one of the landowners regarding the two containers left at the site, which were rusting, leaking and had bullet holes in them. DEQ's investigation revealed the barrels contained NORM materials, and it cited Jolen for failing to properly store the materials. Jolen removed the barrels from the property and DEQ rechecked the cite. In June of 1997, DEQ released the property for unrestricted use.
At different points in time, all of the well sites, with the exception of one area at the Simoneaux 1 site, where the central saltwater disposal facility was located, were closed in compliance with 29-B regulations and certificates for 29-B clearance were issued at those sites. Mr. Stover attested that the Simoneaux 1 site could not be closed due to concern over the amount of chlorides at the surface.
After the filing of this lawsuit, extensive soil and groundwater testing was undertaken at all seven well sites in the Napoleonville Field by plaintiffs and Amoco, the results of which were presented to the jury. Plaintiffs offered evidence that groundwater and soil samples taken at the site revealed levels of hazardous substances, including arsenic, lead, barium, chromium and radium that were above "background" levels and above minimum allowable limits set by the Environmental Protection Agency. The term "background" refers to a measurement taken by analyzing soil and water samples that have not been affected by oil and gas operations, and comparing the contents of the background sample to the samples taken at the site where those activities did take place in order to determine whether there is contamination. Plaintiffs presented three principal witnesses to support their claim of widespread contamination at the Napoleonville Field: Dr. Jeffrey Hanor, an expert in geology, hydrogeology, and geochemistry; Dr. Paul Templet, DEQ's secretary from 1988 to 1992 and an expert in chemistry, environmental chemistry and environmental management; and Jack Waggener, a remediation expert. Plaintiffs' witnesses relied on the results of testing performed by ICON Environmental Services. ICON used aerial photographs to identify the old pit sites, then conducted a terrain conductivity meter to determine the distribution of saltwater under the ground. Utilizing data gathered at the field, ICON made contour maps showing areas of high and low conductivity, from which a determination of the distribution of saltwater was made. ICON took three types of borings to test the soil and ground water within the areas of salt concentration it identified and had those samples analyzed for chloride, barium, arsenic, chromium and lead concentrations.
Plaintiffs' witnesses testified that there is a strong correlation between a high concentration of chlorides and a high concentration of contaminants of other types, such as radium, arsenic, chromium and barium. According to plaintiffs' witnesses, wherever there was a high concentration of chlorides, one could also expect to find a high level of metals and radioactivity.
Dr. Hanor opined that there is contamination at the site resulting from the use of production pits from 1958 to 1985. He stated that produced waters dumped into these pits could never evaporate because of the sizeable rainfall Assumption Parish receives. As a result, the produced waters migrated out of the pit into the surrounding soil and sediment, resulting in a "plume" of contaminated water under the ground surface.
Dr. Hanor testified that everywhere there was a production pit, there was an introduction of saltwater, and where there was saltwater, there was a contaminant plume surrounding it, which included excess *570 dissolved radium. However, his testimony focused on the Simoneaux 1 site. Utilizing the ICON contour data, Dr. Hanor noted that at the former pit at the Simoneaux 1 site, the highest level of chloride was 60,000 milligrams per liter, which is three times the salinity of seawater. According to his calculations, 100,000 barrels, or 400 million gallons of produced water had been released at the Simoneaux pit. Dr. Hanor stated that between 1,900 and 2,000 tons of sodium chloride had been introduced into the environment at the field. He testified that there was contamination at the field caused by produced water as seen by the elevated levels of chlorides, as well as contamination caused by drilling mud fluids, seen in the elevated levels of barium and lead at the various well sites.
Dr. Hanor testified that there had been a peripheral lateral migration of the contaminated fluid into the vicinity of Simoneaux 1 down through the clay-rich sediments. He attested that from the ICON data, one could determine that there was saltwater contamination down to depths of 30 feet because chloride levels were above background at that depth. Dr. Hanor opined that as an inevitable consequence, the salt would migrate down underneath the pits into the underlying aquifer. He attested that the contamination had to be cleaned up to protect the environment and stated that the fastest way to clean the contamination at the site was to excavate and backfill with clean dirt.
On cross-examination, Dr. Hanor admitted he made a determination of the actual area of contamination based on chloride concentrations compared to secondary drinking water standards, which are based on parameters such as taste and smell, rather than parameters dealing with toxicity or danger to human health. He also admitted that he had no data to indicate that any surface water bodies such as canals or ditches had been contaminated by salt from the Napoleonville Field.
Dr. Templet visited the site a year before trial, reviewed the groundwater and soil sample data, and compared that data to current regulatory standards. He stated that all seven sites in the field showed levels of one contaminant or another that exceeded EPA standards for groundwater, and some of the sites showed soil contamination above background levels. Dr. Templet testified that the oilfield waste contamination was at high, dangerous levels, with the highest area of contamination found at Simoneaux 1. Dr. Templet attested that the contamination found at each of the sites needed to be cleaned up to protect human health and the environment.
Plaintiffs also presented the testimony of John Connolly, a petroleum engineer, who did a radiation study at the Napoleonville Field. Mr. Connolly took a Geiger counter out to the field and walked in the area where the pits had been. He attested that he obtained elevated radiation levels near the old pit sites, in an area in a ditch and an area where the drums of NORM materials left at the site by Jolen had been. On cross-examination, however, it was revealed that Mr. Connolly was not certified in the use of a Geiger counter and had no formal training in using the instrument, but had spent about two minutes getting instructions on how to use it from a DEQ radiation safety officer. He also admitted that the Geiger counter he used was ten years old, had been stored in a warehouse that was not climate controlled and there was no calibration data on the Geiger counter.
Jack Waggener, an environmental remediation expert, reviewed the data collected by both sides as well as the work of a staff of geologists and chemists employed by his company. He opined that *571 both the groundwater and soils of all of the oilfield sites were contaminated with wastes from the oil and gas operations. He stated that the safest and most effective way to clean the contamination was to excavate the dirt and backfill with clean dirt. Mr. Waggener proposed three alternative plans for remediation, with the first costing 33.5 million dollars, and the cheapest costing 21 million dollars.
Defendants' witnesses, however, fundamentally disagreed with plaintiffs' witnesses on the existence of contamination at the site, whether remediation was necessary and the extent of the remediation. Dr. Lloyd Deuel, an expert in soil chemistry and soil physics, reviewed the data gathered by both sides and took his own samples at the site. Dr. Deuel drilled borings directly into the area of the pit at Simoneaux 1, as deep as 33 feet, to determine whether saltwater put into the pit could have migrated either to the surface or into drinking water. He rebutted Dr. Hanor's testimony regarding vertical migration of the saltwater, stating that there was no possible way the saltwater that had been put into the pit could get into the groundwater or drinking water aquifer and contaminate it. He stated that the salt was well confined, it was not moving and it would never move.
Dr. Deuel did research in the 1980s to look at the contents of pits. He studied 750 production pits in Louisiana and found the main constituent of the pits was salt, not heavy metals or hydrocarbons. After analyzing the contents, he used the literature to set acceptable parameters and provided this information to Louisiana regulatory agencies. Louisiana adopted Dr. Deuel's standards as the 29-B regulations, using the most restrictive values Dr. Deuel established.
Dr. Deuel attested that there was no justification for digging up 16 acres of land down to 15 or 20 feet simply to remove salt. He noted that there was already a substantial amount of salt naturally occurring in the area because of the presence of an old buried swamp. Excavating that deep, he stated, would release the sodium chloride contained in the soil. He attested that the only remediation necessary was to dig up the surface of the pit that may affect surface use.
Dr. John Frazier, an expert in radiation detection and NORM screening and remediation, rebutted plaintiffs' witnesses' suggestions that there were high radiation levels in the Napoleonville Field. Dr. Frazier performed his own radiation testing at the Simoneaux 1 site, collected groundwater and soil samples, and reviewed natural background levels of radiation in Louisiana. His sampling showed there were no above background levels of radiation in the soil or groundwater. Dr. Frazier noted that the radiation levels in the soil were actually lower than in normal Louisiana dirt. He also demonstrated to the jury with a radiation detection device that the radiation exposure levels in the courtroom itself were the same measurements obtained at the Simoneaux 1 site. Dr. Frazier criticized the ICON radionuclide analysis testing as unreliable, noting that the laboratory violated its own procedure and arrived at its numbers through speculation.
Defendants' witnesses also rebutted plaintiffs' witnesses' testimony that there were other oilfield wastes in the field requiring a massive cleanup undertaking. Mr. Michael Pisani, an environmental engineer specializing in site assessment for soils and groundwater remediation and cleanup plans, analyzed the ICON data, and gathered his own samples to determine whether the groundwater or drinking water was at risk at the site. Mr. Pisani collected 44 soil samples and analyzed each for arsenic, barium, chromium, lead and *572 salt. He testified that all samples, with the exception of salt, were within the 29-B closure criteria. He further testified that he analyzed the data to see if there was a correlation between the concentration of chlorides and other elements to test plaintiffs' witnesses' theory that as saltwater concentration increased, so did the concentration of other elements. Mr. Pisani said that with respect to arsenic and lead, the opposite resulted: for example, the highest arsenic concentrations were related to the lowest salt concentrations. He also noted that while some tests showed elevated barium levels, it was not above any risk criteria and all chromium levels were at background levels.
Mr. Pisani criticized the use of EPA drinking water standards by plaintiffs' witnesses, noting that while such is a correct first step, the witnesses left out a crucial part of the calculation called for in the regulations. Mr. Pisani stated that compared to other oil and gas fields, this site is a very clean field with very little surface impact.
Defendants' witnesses also refuted plaintiffs' evidence regarding the extent of any cleanup needed at the site. Dr. Bradley Droy, a toxicologist who has performed approximately 400 risk assessments involving evaluating chemicals present in various exposure media like groundwater and soil, opined that remediation is not necessary at the site because of the low concentration of chemicals found there. He observed that if a site passes Louisiana's RECAP regulations for remediation, the site was "two to three orders of magnitude [on] the safe side of the equation." RECAP does not address chlorides because the actual toxicity is so low, Dr. Droy explained. His analysis addressed other constituents such as arsenic, chromium, lead, barium and hydrocarbons.
Dr. Droy testified that the sampling data established that with respect to the aforementioned constituents, in every instance for the soil, the levels were either within or below background or below the RECAP criteria. He attested that the site is fit for residential use and emphasized that the Napoleonville Field is the lowest risk site he ever evaluated.
Mr. Pisani criticized the Waggener remediation plan, particularly the proposed dig at Simoneaux 1, as unreasonable. He stated that the plan involved the removal of 1.25 million cubic yards of dirt, or 250,000 18-wheel tractor loads full of dirt, simply to remove salt, which was not a parameter of great concern. He also testified that he had never seen a plan such as this submitted to the Department of Natural Resources (DNR) and doubted whether DNR would ever approve this type of mass excavation.
Mr. Pisani admitted that there was some surface damage to the property, most of which was on top of the old pit at Simoneaux 1. After reviewing all of the data gathered by everyone involved in the litigation, Mr. Pisani recommended excavating the old pit at Simoneaux 1 and putting wells strategically around the site into the deep drinking water aquifer to monitor the area. His plan also included the costs of a subsurface soil program recommended by defense witness Donald Sagrera. The total cost of Mr. Pisani's proposed site cleanup was $375,000.00. Mr. Pisani testified that he discussed the plan with other defense witnesses, some of whom believed it was practical, safe and protective, or thought it was "overkill" in that they did not even believe the pit had to be removed because it did not present a risk problem.
At the conclusion of the trial, the jury was given a series of interrogatories to answer, which began with broad questions regarding liability. The jury was asked *573 whether any of the defendants were negligent, whether any of the pits or oilfield equipment presented an unreasonable risk of harm, and whether plaintiffs sustained property damage caused by the oilfield equipment in the custody or control of the defendants. The jury answered "Yes" to these questions, but found that plaintiffs did not sustain personal injuries as a result. The jury was then asked which defendants were at fault in causing the damages and to assess a percentage of fault for each defendant. When questioned regarding the wells operated by Amoco and then by Jolen and Southoak, the jury found that Amoco, ARCO, Jolen and Southoak were all at fault and assessed 25% fault to each with respect to each of the four wells. As to those sites operated by F.A. Callery and later by Jolen and other operators, the jury found that Amoco and ARCO were not at fault, but found that F.A. Callery, Jolen, Petro-Lewis, Southoak and Vintage Petroleum were at fault with respect to the Dugas and Bourg wells, assessing each 20% fault, and found three of those defendants were at fault with respect to the Hebert well. The jury was then asked whether the defendants breached any mineral lease obligation to restore the leased premises to the extent practicable at each of the well sites. The jury answered "No" for Simoneaux 1, but "Yes" for all other sites.
In the next series of questions, the jury was asked whether any of the sites required cleanup or remediation, and was asked to state the total amount of damages necessary for the cleanup or remediation of each of the well sites. The jury answered "Yes" to the first question, entered the sum of $375,000.00 for the Simoneaux 1 well site, and entered "N/A" for the remaining six well sites. The jury went on to find that none of the plaintiffs had a reasonable fear of contracting cancer or other illnesses and entered "N/A" in those spaces where they were asked to state the amount of damages that should be awarded on these claims. The jury also found that none of the defendants were liable for punitive damages.
Thereafter, the trial judge entered judgment in accordance with the jury verdict in the amount of $375,000.00, dismissing plaintiffs' claims for cleanup and remediation of the Simoneaux 2, 3, Breaux, Dugas, Bourg and Hebert sites. Plaintiffs' JNOV motion was based on numerous alleged inconsistencies in the jury verdict. The trial judge agreed that there were inconsistencies in the jury's responses entered in the verdict form, believing that those inconsistencies required that he grant the JNOV motion and award the plaintiffs $12,907,440.00. He found that by responding affirmatively to the fault questions, the jury found that Amoco and ARCO were liable for the damages sustained at Simoneaux 2, 3 and Breaux, but failed to award damages, requiring that he award appropriate restoration costs for these sites. He also found that the answers to the mineral lease interrogatories and damages interrogatories required that he enter a JNOV for all sites and award appropriate damages for the restoration of all seven well sites.
Additionally, the judge found that it was inconsistent for the jury to find ARCO, a non-operator at all sites, liable for damages at four of the sites and not liable for damages at the other three sites. He concluded that reasonable minds could not have concluded that ARCO had garde of Simoneaux 1 and not the other well sites. The judge then found Amoco liable at the three well sites it did not operate based on its working interest in those sites. The judge reallocated fault at all seven well sites, assessing Amoco and ARCO each *574 with 25% fault for the Dugas and Bourg sites and 40% fault and 25% fault, respectively, for the Hebert site. With respect to the Simoneaux and Breaux sites, the judge increased Amoco's fault to 65% and decreased Jolen and Southoak's percentage of fault to 10%. The judge went on to make an independent assessment of damages based on the record, which he found rendered the jury's $375,000.00 award for restoration of Simoneaux 1 "grossly disproportionate" to the award he found appropriate at the other well sites, based on his acceptance of plaintiffs' experts' testimony. The judge held Amoco and ARCO solidarily liable in tort for the full extent of restoration damages because the acts occurred prior to 1987.
On appeal, the defendants argue that the jury's verdict is substantially consistent with the testimony of its experts, evidencing that the jury believed the defense's experts, not plaintiffs. The defendants posit that because the verdict was based on the jury's credibility determinations, the JNOV must be set aside. They argue that the trial judge completely ignored the jury's acceptance of the defense witnesses' testimony, improperly substituted his own judgment for that of the jury, making his own credibility determinations. Specifically, the defendants contend the trial judge improperly engaged in a de novo review of damages, and improperly adopted plaintiffs' experts' opinions, rejected by the jury, regarding the necessity, method and cost of cleanup.
We agree. While there may have been some minor inconsistencies in the jury's liability determinations, the trial judge was required, in order to overturn the jury's damage verdict, to find that a reasonable jury could not have awarded plaintiffs the sum of $375,000.00. The evidence established, however, that this finding was entirely reasonable based on the evidence, and is supported by the testimony of Mr. Stover, Dr. Deuel, Dr. Frazier, Dr. Droy and Mr. Pisani. Their collective testimony established that: (1) there was no hazardous contaminant at any of the seven well sites posing a risk of harm requiring removal; (2) the only constituent presenting any problem at the site was excess salt; (3) the only site requiring remediation was Simoneaux 1, where the centralized facility had been located, and where nearly all of the testimony for both sides at trial was focused; and (4) the cost to repair the salt damage was $375,000.00. In this case, the defense experts refuted plaintiffs' experts' testimony on the necessity, method and cost of cleanup of the Napoleonville Field. The jury weighed the evidence and accepted the defense witnesses' testimony. Because a reasonable jury could clearly have found that only one site required remediation and the cost of that cleanup was $375,000.00, the judge was not empowered to substitute his own evaluation of the evidence to overturn the damage award. Thus, the trial judge committed legal error by reversing the jury's damage award without addressing the reasonableness of the award. Accordingly, we find the trial judge erred in awarding plaintiffs over twelve million dollars where the evidence reasonably supported the jury's $375,000.00 damage award, and we reinstate the jury verdict awarding plaintiffs that sum for restoration damages.

CONCLUSION
For the foregoing reasons, we reinstate the jury verdict awarding plaintiffs the sum of $375,000.00 for the cleanup of the *575 Simoneaux 1 site.[4] All costs of this appeal are assessed to plaintiffs.
REVERSED AND RENDERED.
FITZSIMMONS, J., concurs and assigns reasons.
FITZSIMMONS, J., concurring with reasons.
Plaintiffs questioned the jurors about residency after the trial, but not before. In addition, I note that the jurisprudence has painted the residency question with a broad brush. Traditionally, the courts have focused on domicile and maintenance of some type of residence in the parish of service. The focus is not on the time spent outside the parish: courts desire jury participation by voters. State v. Daniels, XXXX-XXXX, pp. 14-15 (La.App. 1 Cir. 11/27/01), 803 So.2d 157, 165, writ denied, XXXX-XXXX (La.11/27/02), 831 So.2d 272; State v. Governor, 331 So.2d 443, 448 (La. 1976). While I agree that the plaintiffs were not entitled to a new trial based upon the evidence presented to the trial court, I am not certain that a vote of nine qualified jurors validates juror disqualification under all circumstances. In my view, this is a very close call.
The inconsistencies in the verdict did not render the jury's essential findings of liability and damage invalid. Specifically on the issue of ARCO's liability, the record reasonably supports a finding that ARCO, in its various agreements, retained certain rights and derived a benefit from the project. In my opinion, under the particular facts here, those rights and benefits were sufficient to support a finding of liability for remediation of the damages suffered. See Young v. City of Plaquemine, XXXX-XXXX, p. 3 (La.App. 1 Cir. 5/10/02), 818 So.2d 898, 899, writ denied, XXXX-XXXX (La.9/30/02), 825 So.2d 1196.
For these reasons, I respectfully concur in the affirmance of the jury's award of damages and its finding that Amoco and ARCO are liable for the un-remediated damage at one site.

WRITTEN REASONS
On September 26, 2003, this court rendered judgment in Simoneaux v. Amoco Production Company, XXXX-XXXX (La.App. 1 Cir. 9/26/03), reinstating a jury verdict that awarded the plaintiffs the sum of $375,000.00 for remediation of one site on which oil and gas exploration activities had been conducted. In so doing, this court found that the evidence reasonably supported the jury's acceptance of defense witnesses testimony that: (1) there was no hazardous contaminant at any of the seven sites involved in the litigation posing any risk of harm; (2) the only constituent presenting any problem at the site was excess salt; and (3) the only site requiring remediation was Simoneaux 1, which, according to defense witness Michael Pisani, would cost $375,00.00.
The Simoneaux plaintiffs filed an application for a rehearing challenging the correctness of this court's decision, as well as two motions to remand. They urged that this court was obligated to remand the matter to the trial judge for a determination of an appropriate remediation plan. In support thereof, the Simoneaux plaintiffs rely on Act 1166 of 2003, which enacted La. R.S. 30:2015.1, to provide a set of procedures to be followed in litigation wherein the plaintiffs seek "to recover damages for the evaluation and remediation of any contamination or pollution that is alleged to impact or threaten usable ground water." La. R.S. 30:2015.1 B. The *576 act provides that it is to be applied both procedurally and retroactively to cases filed after August 1, 1993.
The Simoneaux plaintiffs contend that the trial court made a determination that contamination existed which poses a threat to public health requiring evaluation or remediation to protect usable ground water, thereby triggering the procedural requirements of La. R.S. 30:2015.1 D. That provision requires that when a court has made such a determination, it adopt the most "feasible plan" to protect usable ground water, after providing the Department of Natural Resources or the Department of Environmental Quality an opportunity to provide input into the formulation of the plan. Therefore, plaintiffs urge, this court must remand the case so that the trial court may receive and examine plans from all parties and DNR and DEQ, and then adopt the most feasible plan to protect usable ground water.
We disagree. Part D requires a finding by a court that contamination exists which poses a threat to public health requiring an evaluation or remediation to protect usable ground water. A finding of liability by the jury does not equate to ground water contamination or automatically trigger the provisions of the Act. There has not been a judicial determination that contamination exists at Simoneaux 1 which poses a threat to the public health or to usable ground water. Therefore, Part D does not apply, and we hereby deny plaintiffs' motion for remand on this ground, as well as the amended application for rehearing.
Based on the foregoing, the application for rehearing is denied, and the motion to remand filed October 9, 2003, is denied. Amoco's motion for reconsideration of this court's decision allowing plaintiffs to file a supplemental brief is likewise denied.
FITZSIMMONS, J., dissents in part and agrees in part.

ON APPLICATION FOR REHEARING
FITZSIMMONS, J., respectfully disagrees with the majority's decision not to remand.
In my opinion, the trial court's findings concerning the groundwater were sufficient to trigger La. R.S. 30:2015.1 D. In all other respects, I agree with the denial of the various motions for re-hearing.
NOTES
[*] Judge William F. Kline, Jr., Retired, serving Pro Tempore by special appointment of the Louisiana Supreme Court.
[1] Suits filed by other property owners at different times were later consolidated in the trial court. Newpark Resources was also sued and later dismissed.
[2] Amoco filed third party claims and cross claims against Jolen Southoak, ARCO and Vintage. Plaintiffs filed a motion to sever these claims from the trial, asserting they would retard the progress of the principal action. The trial judge granted the motion.
[3] The defendants sought writs on the denial of their jurisdictional challenge, which were denied by this court and the Louisiana Supreme Court. See Simoneaux, et al. v. Amoco Production Company, et al., 98cw1852 (La.App. 1 Cir. 10/8/98), 98-2645 (La.10/28/98), 723 So.2d 437.
[4] Because of our ruling, the plaintiffs' motion for a remand to correct the judgment to include the names of the defendants against whom it was rendered is denied.